*In re* E.M., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Catherine Moore, Respondent-Appellant).

Fourth District   No. 4—01—0819

Opinion filed March 27, 2002.

McCULLOUGH, P.J., dissenting.

Alan J. Novick, of Jennings, Novick, Smalley & Davis, P.C., of Bloomington, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Norbert J. Goetten, Robert J. Biderman, and Perry L. Miller, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

Following a hearing in the circuit court of McLean county, E.M. was found to be a neglected minor and made a ward of the court. Respondent mother, Catherine Moore, appeals, contending the finding of neglect was against the manifest weight of the evidence. We agree and reverse the trial court's judgment.

## I. BACKGROUND

On March 19, 2001, the State filed a petition for adjudication of wardship, alleging E.M., born February 20, 1991, was neglected due to her residing in an environment injurious to her welfare (705 ILCS 405/2—3(1)(b) (West 2000)) because (1) Catherine's paramour (Bryan Moore) strikes her and Catherine fails to protect E.M. from harm; and (2) Catherine "engages in acts constituting emotional abuse" by telling E.M. she wishes she had not been born, she does not want E.M., and she will have to choose between E.M. and her paramour, all causing E.M. to express the desire to die. On June 1, 2001, the State filed an amendment to the petition for adjudication of wardship alleging E.M. was residing in an environment injurious to her welfare because Catherine has unresolved issues of anger management.

The trial court held an adjudicatory hearing on June 1 and July 2, 2001, on the State's neglect petition. Abbie Soltwedel testified she was E.M.'s day-care provider for the previous two years for before- and

after-school care. Sometime in January 2001, Soltwedel overheard E.M. tell another child in day care Bryan "stomped" on her foot. Soltwedel noticed E.M. was walking without a problem and she never mentioned this incident to Catherine. On another day, Soltwedel heard E.M. tell another child Bryan threw her into a wall. E.M. was in trouble for something when this happened. E.M. did not seem upset when she told the story.

A few days after Soltwedel heard this second story, E.M. did not want to go home. Soltwedel asked her why and E.M. showed her some bruises and a cigarette burn. This occurred the day before Soltwedel called the police, in the middle of March. If E.M. had not mentioned the bruises, Soltwedel would not have noticed them. E.M. told Soltwedel how Bryan had inflicted each bruise. Soltwedel called the police because as a licensed day-care provider, she is a mandated reporter. Soltwedel was present when E.M. spoke to the police and the Department of Children and Family Services (DCFS) investigator. She had never seen E.M. that upset before. E.M. cried very hard.

Prior to this, in February or March, Catherine had told Soltwedel E.M. was having trouble in school and was a liar. Catherine seemed angry at the time. On one occasion E.M. had come to day care and was crying. Soltwedel asked E.M. what was wrong and E.M. said Catherine had said she did not want E.M. anymore. Soltwedel asked Catherine about the statement and Catherine stated she did not mean it. Soltwedel told E.M. sometimes people say things out of anger they did not mean. E.M. told Soltwedel Catherine never said any other things like that.

In early 2001, E.M. told Soltwedel Catherine was going to marry Bryan. E.M. seemed happy about this. Soltwedel did not notice any change in E.M.'s attitude until the last few days before she was taken into protective custody on March 14. She never noticed any arguments between Bryan and E.M., nor did E.M. ever seem afraid of Bryan when he picked her up.

Soltwedel was aware E.M. had problems at school involving not doing her homework, and she knew Catherine had admonished E.M. about this. Catherine also admonished E.M. about caring for her dog.

Soltwedel characterized E.M. as an angry child who likes to fight with other children at day care. Sometimes she fought daily for a week and Soltwedel had to intervene. The fights were mostly verbal, not physical. The previous year Soltwedel threatened to kick E.M. out of day care because of this. After speaking with Catherine, Soltwedel gave E.M. another chance and E.M.'s behavior improved. E.M. was known to embellish stories and was not honest about who started the fights. She also made up stories about homework and other things.

Soltwedel told the police E.M. "cried wolf" before and would stretch the truth.

Daniel Barbic, E.M.'s fourth-grade teacher, also testified for the State. Throughout the 2000-01 school year, he had concerns about how E.M. was adjusting to fourth grade because she had few friends, had trouble keeping the ones she had, and did not get homework assignments done. E.M.'s work went up and down all year. E.M. embellished stories when she wanted to make a point or win an argument. She had many excuses for not completing her homework. She was manipulative and tried to get extra time to hand in her work. E.M. strove for attention and would get it whether negative or positive. E.M. "cried wolf" frequently before gym class to get out of attending or after gym class about injuries she may have received there. Barbic had warned E.M. about "crying wolf," but he did not think she understood what he meant. E.M. knew she would not participate in basketball practice or games if she was not doing her homework. This was a school policy as well as Catherine's policy.

Barbic met or talked with Catherine several times to discuss E.M.'s school performance. At their first conference in November 2000, Catherine told Barbic she was displeased with E.M.'s performance in school and at home. Catherine said E.M. made her sick to her stomach and she wanted to puke. Catherine said she was just starting a new job and E.M. was not making life easy for her. Barbic got the impression Catherine was a "mom that was having a very bad day and she was very upset with her daughter and she was venting." She did not know what to do with E.M. Barbic stated, after the State's suggestion, Catherine said she wanted to punch E.M.'s teeth out.

Barbic met with Catherine, Bryan, and Catherine's mother in February 2001, in response to a downturn in E.M.'s work in January and comments E.M. had made to Barbic which prompted him to call DCFS in January. E.M. told Barbic she was hit by Bryan. He threw her up against the wall, and she landed on the bed. E.M. also told Barbic she wanted to die. Barbic did not notice anything physically wrong with E.M.

At the February meeting Catherine was cooperative and respectful. Bryan explained his relationship was to support Catherine in raising and disciplining E.M. Bryan related an incident with E.M. where she screamed down the stairs at Catherine and he thought that was very inappropriate. Barbic did not get the impression Bryan had any problems with E.M. Barbic speculated this was a case where there was a new person in the family whom E.M. resented. Both Catherine and Bryan expressed their thoughts E.M. was telling stories again.

Barbic talked to Catherine about family counseling and later gave

her references to call. Catherine told Barbic she called for counseling and follow-up but there was a concern about the cost of the services.

Judy O'Brien, a child protective investigator for DCFS, testified she met E.M. at the police station along with Soltwedel. E.M. told O'Brien she had a lot of bruises from Bryan. E.M. claimed Catherine knew Bryan hit her and told her she deserved it. Bryan became physically abusive after he moved into their home. E.M. explained the cigarette burn as having occurred when her dog pulled her sweatpants down and Bryan walked by and held a cigarette to her thigh. She initially thought it was an accident but did not think so anymore. E.M. was emotional during the interview and appeared to be heartbroken or hopeless. She sobbed for 15 to 20 minutes as she told her story. She stated she did not want to return home.

E.M. mentioned Catherine had been verbally abusive to her for years, calling her "stupid" or "retarded." She threatened to send E.M. to boot camp and said she did not like E.M. and did not want her because E.M. was in the way. E.M. believed she was in Catherine's way in her relationship with Bryan. E.M. told O'Brien that Catherine had taken E.M.'s bedroom away from her and she had to sleep on the couch. O'Brien spent five to six hours with E.M. the day she interviewed her and asked her about her statement she wanted to die. E.M. said since she was not returning home, she no longer felt that way.

Catherine told O'Brien she did not believe E.M.'s story. Catherine stated E.M. is a good actress, makes up stories, and lies. Catherine told O'Brien many of E.M.'s stories involved excuses for not turning in homework. E.M. completes her homework but does not turn it in. E.M. had complained to O'Brien about losing her birthday presents. Catherine explained these were taken away because of bad grades and bad behavior. Catherine admitted telling E.M. she might have to go to boot camp as a wake-up call. Catherine knew about the cigarette burn incident and stated Bryan was playing with E.M. and was holding her above his head while smoking a cigarette when he dropped her. Bryan burned his own mustache in the process as well as burning E.M.'s leg.

O'Brien noted that Soltwedel and Barbic both told her E.M. made up stories and may have embellished the truth. She learned E.M. was almost kicked out of day care due to behavior and physical aggression toward other children. Barbic told her E.M. had "cried wolf" in the past.

Catherine was very upset when she first spoke with O'Brien. The next day she was cooperative but never admitted any abuse. Catherine agreed to do whatever necessary to obtain E.M.'s return home. Catherine explained E.M. was not in her bedroom due to repeated head-lice infestations and the need to thoroughly clean her room.

Eleanor Mattern, E.M.'s maternal grandmother, testified for Catherine. Eleanor was close to both Catherine and E.M. She knew E.M. was having trouble getting schoolwork done and attended the February conference. According to Barbic, E.M. had a new excuse each time. E.M. used the excuse at home that Barbic did not properly assess grades and that she got less credit than she should have. Barbic expressed no concerns about Catherine.

E.M. said she had been bruised and changed her stories about where the bruises came from. E.M. was good at telling stories. E.M. said Bryan stomped on her foot, pushed her against a wall, and sent her to bed hungry at 6 p.m. Eleanor saw E.M. every couple of weeks and saw no evidence of E.M.'s allegations. Eleanor was present when lice were discovered on E.M. She was very surprised when O'Brien arrived at her home with E.M. for a foster-care placement.

Bryan was charged with two misdemeanor counts of domestic battery for stomping on E.M.'s foot and burning her with a cigarette. He was acquitted after a jury trial. E.M. testified at that trial the allegations of the criminal complaint may have been inflicted accidentally. Other allegations of abuse from this juvenile case arose in that trial, and E.M. stated those bruises could have been accidental also. Bryan testified E.M. knows the truth and that is why she changed her story at trial.

Bryan explained he stepped on E.M.'s foot by accident when she was lying on the floor by the sliding door. He explained he was playing with E.M. and "bench pressing" her over his head when he dropped her. He burned his mustache as well as her leg. E.M. laughed at the time. Bryan admitted he was guilty of holding her over his head with a lit cigarette in his mouth.

Bryan testified he never heard Catherine state she did not want E.M. E.M. was present when he proposed to Catherine and seemed excited at the time. He moved in with them in December 2000. E.M. never stated she did not want Bryan living there. However, at the time E.M. was removed from the home, Bryan thought she did not want him to live there. Her stories had dramatically escalated.

Catherine knew of the need for counseling but she could not get it until April through her health insurance. Without the insurance, the cost was more than she could afford.

Bryan never imposed physical discipline on E.M. He only made her stand in the corner. Catherine did most of the discipline. He verbally reprimanded her. He was assertive in terms of her school performance and when she showed a lack of respect to Catherine. Bryan denied calling E.M. stupid or a brat. " 'We' " might have said it was stupid to do homework and not turn it in to get credit for it. " 'We' " told her not to do stupid things.

E.M. was on academic probation at the time of the meeting with Barbic. Her daily and weekly grades were D's and F's. E.M. would make up different stories about why her homework was not turned in. If E.M. got caught in a lie she would not back down. She accused Barbic of recording her grades wrong. E.M. is hard to control, stretches the truth, and is very dramatic.

Catherine testified she never saw Bryan bruise E.M. E.M. told her some of her bruises came from scooters in gym class. E.M. never told her the story of a dog pulling down her sweatpants but that Bryan was "bench pressing" her when she got the cigarette burn. Catherine applied first aid cream to the burn.

Catherine denied telling E.M. she wanted Bryan but not her. She never called her stupid or retarded. E.M. exaggerates things and sometimes lies. Catherine loves E.M. very much and wants her home.

Catherine had always been a single parent and admitted it was not easy on E.M. There was never another person in their lives before Bryan. E.M. had a good relationship with Bryan before he moved in. She was excited about Bryan proposing to Catherine. She gave no indication she did not want Bryan around. In retrospect, Catherine believes E.M. was trying to break up her relationship with Bryan. She believes E.M. wanted Bryan to leave because he was not soft on discipline like she is. If she grounded E.M. for a week, she would relent after a few days. Bryan would be likely to enforce the entire week.

E.M. has had behavioral problems for a long time. She was first dismissed from a YMCA day-care program at age four. Soltwedel threatened to kick her out of her day care. E.M. made up stories about Soltwedel's daughter. E.M. had the same issues at school, telling stories about other children.

E.M. lost her bedroom due to repeated infestations of lice, not as a punishment. E.M. had really long hair and it had to be cut.

E.M. was intelligent but would not turn in homework. She would criticize Barbic and say he did not grade correctly. Catherine followed through on Barbic's recommendation for counseling and started the process of obtaining it prior to E.M. being taken into protective custody. It could not begin until April 2001 due to insurance-coverage issues. She agreed with Barbic counseling was necessary.

In her conference with Barbic, he told her E.M. was placed on academic probation due to low grades and was in jeopardy of not passing fourth grade. She admitted she was upset. She told Barbic if she had come home with those grades, her dad would have punched her teeth out. Catherine is sometimes ill due to a chronic physical condition and it causes her to vomit when she is stressed. She might have said E.M.

made her sick to her stomach because, when E.M. upset her, she would often become ill.

On the day E.M. was taken into protective custody, E.M. was crying when she was dropped off at Soltwedel's day care because she failed to do her homework and was told she was not going to be in basketball. Catherine had not told her she did not want her.

Since Catherine and E.M. have been apart, E.M. has reported her desire to return home and has expressed herself in the same dramatic fashion, stating she will die if not returned to Catherine.

The trial court gave thoughtful consideration to this case and carefully weighed the facts. It found the physical abuse allegations were not proved, nor was it shown Catherine had unresolved issues of anger management. The only ground for neglect proved was an injurious environment due to emotional abuse to E.M. on the part of her mother, Catherine. The court stated it was a very close case. The court found E.M. to be a troubled child and counseling for both E.M. and Catherine was of the utmost importance. In making its findings, the court expressed its concerns that DCFS and the State not pursue neglect charges against parents every time 10- or 11-year-old girls (or boys) expressed unhappiness with their parents who "did not understand" them.

The trial court entered an order of adjudication on July 2, 2001, finding the allegations of emotional abuse had been proved and the other allegations not proved. E.M. was adjudicated neglected pursuant to section 2—3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2—3(1)(b) (West 2000)). On August 22, 2001, the court entered a dispositional order finding E.M. should be made a ward of the court and Catherine to be unfit. Catherine appeals this finding of neglect.

## II. ANALYSIS

■ When the State files a petition alleging neglect on the part of a parent, it must prove the allegations by a preponderance of the evidence. *In re N.B.*, 191 Ill. 2d 338, 343, 730 N.E.2d 1086, 1088 (2000). Each allegation of "injurious environment" made pursuant to section 2—3(1)(b) of the Act (705 ILCS 405/2—3(1)(b) (West 2000)) calls into play an "an amorphous concept" which is, by its very nature, unique and which requires looking at the circumstances of that individual case (*In re S.D.*, 220 Ill. App. 3d 498, 502, 581 N.E.2d 158, 161 (1991)). Thus, a finding of neglect on this ground will be reversed only if it is against the manifest weight of the evidence. *N.B.*, 191 Ill. 2d at 346, 730 N.E.2d at 1090.

■ In this case, we find the trial court's decision is against the manifest weight of the evidence. Catherine's alleged *words* to her daughter in this case are not enough to prove emotional abuse. Evi-

dence of any words spoken must be presented in context, and there should be evidence of the harm or distress caused by the words.

We note Catherine denied most of the remarks E.M. claimed her mother made. Catherine did admit the boot camp remark, which may have been an ill-advised attempt to issue a wake-up call. Even if the remarks were made, it is likely E.M. added her own gloss to them. Further, there was not sufficient evidence of a pattern of such remarks.

As reported to her day-care provider, such remarks were made only once. As reported to O'Brien, they were made over a period of time. They were not reported at all to Barbic. E.M.'s comment to Barbic that she wanted to die was in response to the allegations she made of physical abuse which were not proved. There was no evidence of the actual effect of the alleged remarks on E.M. She has had a long-standing behavior problem, had done poorly in school, and is known for lying, fabrication, and exaggeration. There is no suggestion her behavior was caused by emotional abuse. Further, prior to the filing of the petition for wardship, Catherine sought counseling to address the problems with E.M., and every indication was that she would follow through with this avenue once her health insurance would pay for the sessions.

Soltwedel and Barbic, as mandated reporters, were required to report E.M.'s complaints of physical abuse and were correct in doing so. An investigation by DCFS was appropriate. However, this family's problems were being addressed by the family and the school and did not warrant this degree of intervention by the State. As the trial court noted, the photographic evidence of E.M.'s bruises showed no more than normal childhood bruises. The circumstances surrounding E.M.'s allegations included a new member of the household after never having to share her mother with another, the imposition of necessary discipline to attempt to change E.M.'s ongoing behavioral and scholastic problems, and E.M.'s known history of fabrication and exaggeration. These circumstances would likely have prompted a much different response had the allegations of physical abuse not been present.

While we do not give our seal of approval to any of the reported comments, one can understand Catherine's frustration with E.M. Unkind or spiteful comments by a parent may be criticized, but, in the context of this case, they did not constitute emotional abuse or create an injurious environment for E.M.

We are troubled by the indication in the record that, after initially stating she would do whatever was necessary to gain E.M.'s return home, Catherine failed to cooperate in the counseling and other services provided to her by DCFS. It appears this response was because of frustration and a weary disbelief that E.M. could be removed from

her custody in these circumstances. Instead of complying with DCFS efforts designed to return her child home, she chose to appeal the trial court's ruling on the adjudication of neglect. She was entitled to appeal and has prevailed, but this was a risky strategy. It may have constituted a waste of precious time in which mother and daughter could have been engaged in the counseling, which every one involved in this case knows is of paramount necessity.

For the foregoing reasons, we reverse the judgment of the trial court finding E.M. to be neglected.

Reversed.

APPLETON, J., concurs.

PRESIDING JUSTICE McCULLOUGH, dissenting:

I respectfully dissent and disagree with the majority's disposition, which reverses the trial court's adjudication of neglect. This court's standard of review is manifest weight while the trial court's order is based upon preponderance of the evidence.

Section 2—3(1)(b) of the Act (705 ILCS 405/2—3(1)(b) (West 2000)) concerns a child under 18 years whose environment is injurious to her welfare. The section does not put the onus on mom and dad to the exclusion of the child. In the instant case, mom and the child are the principals involved in the environment injurious to the child's welfare.

E.M., perchance through no fault of her own, has developed into a belligerent, aggressive, and untruthful 10 year old. The mother must assume some of this responsibility. At 10 years old, E.M.'s emotional makeup and personality are also appropriate factors to be considered by the trial court in its finding of an environment injurious to her welfare. Here, it appears to be a combination of all the parties involved, but especially the child.

This child is more than a handful. Parents can be sincere and want to do what is best for the child, but the honest mistakes made by mom and the child's unwillingness to help herself are sufficient to prove neglect.

As suggested by the State's brief, "neglect" can result from either willful or unintentional disregard of parental duty (*In re Brooks*, 63 Ill. App. 3d 328, 337, 379 N.E.2d 872, 879 (1978)) and cannot be defined with particularity (*In re S.D.*, 220 Ill. App. 3d at 502, 581 N.E.2d at 161). I also agree with the reference to section 2—3(1)(b) and its background set forth in the majority (328 Ill. App. 3d at 640).

The respondent by her own testimony acknowledged the need for action on her part and this can be considered as evidence of neglect.

The evidence reviewed by the majority is more than sufficient to justify the trial court's finding of neglect and a disposition with a permanency goal of return home within 12 months.

We should affirm the trial court's judgment.